**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY CHAPPELL,** | : | **Case No. 1:06cv2135** |
| **Administratrix of the Estate of** | : | |
| **Deceased Brandon McCloud,** | : | |
| | : | |
| **Plaintiff,** | : | **JUDGE O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF CLEVELAND,** *et al.*, | : | **OPINION & ORDER** |
| | : | |
| **Defendants.** | : | |

Before the Court is the *Motion for Summary Judgment of Defendants John Kraynik and Philip Habeeb* (Doc. 62).  For the reasons discussed below, the motion is **DENIED**.

## I.  BACKGROUND

This case arises from the tragic shooting death of 15-year-old Brandon McCloud in the City of Cleveland, Ohio during the early morning hours of September 1, 2005.  Plaintiff, Dorothy Chappell, the grandmother of McCloud and Administratrix of his estate, has filed an action against Defendants, City of Cleveland Police Detectives Philip Habeeb and John Kraynik (collectively, the "Detectives"), alleging that the Detectives used excessive and unreasonable deadly force by shooting McCloud and causing his death while executing a search warrant in Chappell's home.  Chappell has asserted the following causes of action against the Detectives:  (1) a Fourth Amendment excessive force claim under

1

42 U.S.C. § 1983;[1] and (2) Ohio law claims for (a) assault and battery; (b) reckless conduct; (c) wrongful death; and (d) survivorship.

The Detectives have now filed a joint motion for summary judgment. The Detectives first argue that they are entitled to qualified immunity from Chappell's § 1983 claim as a matter of law, because Chappell cannot establish that they acted in an objectively unreasonable manner under the applicable constitutional standards. More specifically, the Detectives contend that the undisputed facts confirm that, at the time they had to make the "split-second" judgment about whether to use deadly force – the moment in which they assert the Court must judge the reasonableness of a police officer's conduct according to binding Supreme Court and Sixth Circuit precedent – they were confronted with a criminal suspect who had unexpectedly and suddenly moved out of a closet in a small, dark bedroom with a knife in his right hand. Accordingly, the Detectives claim, in light of those undisputed facts, the Court must conclude that they had probable cause to believe that McCloud presented a serious threat to their physical safety and that they therefore did not violate any clearly established legal standards in using deadly force. Second, the Detectives argue that, particularly if they are entitled to qualified immunity under § 1983, they also should be granted statutory immunity under Ohio law from Chappell's state law claims.

Chappell, on the other hand, has vigorously opposed the Detectives' joint motion. Chappell argues that: (1) the shooting was unjustified; (2) there are critical and material factual disputes that preclude the entry of summary judgment in favor of the Detectives; and (3) the Detectives'

---

[1] Chappell alleges that the Detectives' conduct violated both the Fourth Amendment and the Fourteenth Amendment. (Doc. 1-2 at ¶ 23.) In the context of the right to be free from excessive force, however, the Sixth Circuit applies a Fourth Amendment seizure analysis to the claims. *See Baker v. City of Hamilton*, 471 F.3d 601, 606 n.4 (6th Cir. 2006) (citing *Ciminillo v. Streicher*, 434 F.2d 4612, 465-66 (6th Cir. 2006)).

2

characterization of controlling precedent is far too narrow.

## II. STATEMENT OF FACTS

At approximately 5:00 A.M. on September 1, 2008, Detectives Habeeb and Kraynik were executing a search warrant at Chappell's and McCloud's residence located at 7712 Jeffries Avenue in Cleveland, Ohio, when they shot and killed McCloud in his bedroom.  Many of the events leading up to the shooting, the events during the shooting itself, and the events after the shooting are at least marginally disputed by the parties.  The statement of facts articulated below specifically identifies each factual dispute; otherwise, if not specifically identified, a fact is not deemed to be in dispute.[2]

### A.    The Events Leading To The Detectives' Use of Deadly Force On September 1, 2005

On the evening of August 31, 2005, Detectives Habeeb and Kraynik were investigating an armed robbery of a pizza deliveryman at knifepoint.  (Habeeb Dep. 87:11-91:5, May 30, 2007; Kraynik Dep. 41:24-42:22, May 29, 2007.)  During the robbery, the victim, who had received a phone call to deliver pizza to an abandoned home, suffered a broken arm while trying to avoid the advance of a knife-wielding suspect who was wearing a gray wig, a wolf mask, and a long-sleeved black shirt.  (Habeeb Dep. 90:17-91:5; Kraynik Dep. 42:13-46:1.)  The robbery took place at the 7800 block of Jeffries Avenue in Cleveland, which was near the residence of Chappell and McCloud at 7712 Jeffries Avenue. (Habeeb Dep. 89:13-21; Kraynik Dep. 41:24-42:2.)

Upon learning the details of the robbery, both Detectives Habeeb and Kraynik immediately believed that McCloud was the primary suspect, in part because McCloud previously had admitted to

---

[2]  The separate and legally dispositive issue as to whether any of the disputed facts amount to a "genuine issue" of "material fact" under the summary judgment standard stated in Rule 56 of the Federal Rules of Civil Procedure will be addressed in great detail below in the Law & Analysis section.

committing 10-12 similar pizza delivery robberies with the same modus operandi and in the same

general vicinity.  (Habeeb Dep. 81:5-8, 88:13-16; Kraynik Dep. 46:3-15.)  Detectives Habeeb and

Kraynik had first met McCloud in May 2005, when they interviewed him about his involvement in

these other pizza delivery robberies.  (Habeeb Dep. 80:7-10; Kraynik Dep. 25:9-19.)  During this May

2005 interview, which lasted for several hours, Detectives Habeeb and Kraynik stated that McCloud

told them, in great detail, how he committed the robberies.  (Habeeb Dep. 80:7-84:5; Kraynik Dep.

36:23-37:14.)  For example, Detective Kraynik described McCloud's participation in these robberies

as follows:

> From top to bottom Mr. McCloud admitted to participation in each and every incident.  He
> admitted to committing the aggravated robbery.  Each time he told me, specifically, what he did
> it with, what weapons he used.  Mostly knives, but in one or two of the instances he did use a
> firearm.  I believe it was a – he said at one point he had used – actually beat someone over the
> head with it in the course of he was running away and he lost the weapon, that's why he went
> back to knives.  But without hesitation he told me of his participation in each and every incident
> that I put up on that board.

(Kraynik Dep. 36:23-37:11.)[3]

Detectives Habeeb and Kraynik, now believing their primary suspect to be McCloud, who they

knew from the May 2005 interview had made a practice of fleeing from robberies through backyards

while discarding clothing items to change his appearance, continued their investigation of the pizza

delivery robbery by searching nearby backyards where an eyewitness had observed the robber.

(Habeeb Dep. 91:8-92:17; Kraynik Dep. 48:11-49:1.)  During the search, the Detectives recovered a

gray wig and a long-sleeved black shirt in a backyard just north of the home where the pizza was

supposed to be delivered.  (Habeeb Dep. 92:20-93:3; Kraynik Dep. 48:22-49:1.)

---

[3]  After his May 2005 confession, McCloud was charged as a juvenile for the robberies.  As
a result of a plea agreement, he was determined to be a delinquent based on one robbery in July
2005.  He was placed on probation, with initial home detention.  (*See* Kraynik Dep. 38:5-40:23.)

After depositing this evidence with uniformed officers, Detectives Habeeb and Kraynik then attempted to acquire information associated with the number of the phone that called the pizza delivery restaurant.  (Habeeb Dep. 93:24-94:16; Kraynik Dep. 51:14-22.)  This investigation revealed the identity of a young female who had placed the order.  (*Id.*)  The Detectives proceeded to interview the female, who advised that she had placed the order at the request of other individuals, including a boy she had met a year earlier.  (Habeeb Dep. 95:11-96:14; Kraynik Dep. 51:14-52:25.)  Using her cell phone, the female provided Detectives Habeeb and Kraynik with two telephone numbers from which she had received the calls asking her to place the orders.  (Habeeb Dep. 95:16-22; Kraynik Dep. 52:20-25.) Investigation of these telephone numbers revealed that one number was linked to a cell phone with no subscriber information available, but that the other number was the hard line listed for 7712 Jeffries Avenue, Chappell's and McCloud's home.  (Habeeb Dep. 96:25-97:10; Kraynik Dep. 52:20-25.)

Next, at around midnight, after a phone consultation with Lieutenant Michael Connelly,[4] Detectives Habeeb and Kraynik went to Chappell's and McCloud's residence at 7712 Jeffries Avenue in an attempt to conduct a consent search of the house for evidence and/or possibly speak with McCloud if he was home.  (Habeeb Dep. 97:11-105:19; Kraynik Dep. 54:13-61:2.)[5]  The Detectives, who were joined by two uniformed officers – Officer Raymond Francell and Officer Kevin Grady, knocked on the door several times, but there was no answer.  (*Id.*)

---

[4]  According to Detective Habeeb, Lieutenant Connelly stated that the Detectives did not "have enough information for an arrest warrant because positive identification had not been made on Brandon McCloud because of the disguise," but Lieutenant Connelly did believe that the Detectives had enough information based on their investigation "to seek a search warrant" or a "consent to search" of the house.  (Habeeb Dep. 97:11-24.)

[5]  It is unclear whether the Detectives ever received authority from a supervisor to conduct the attempted consensual search.  (*See* Habeeb Dep. 102:8-18; Kraynik Dep. 57:21-59:6.)

Detectives Habeeb and Kraynik then returned to their police station to prepare a search warrant application for entry into Chappell's and McCloud's house at 7712 Jeffries Avenue to discover any evidence that would connect McCloud to the pizza delivery robbery.  (Habeeb Dep. 105:20-22; Kraynik 63:3-11, 65:2-7.)  Using a disk of old search warrants from the Cuyahoga County Prosecutors Office, the Detectives finished preparing the application at approximately 3:00 A.M. on September 1, 2005.  (Habeeb Dep. 105:20-107:3, 109:20-111:18; Kraynik Dep. 71:20-73:20.)  At that time, the Detectives drove to the residence of Judge Timothy McGinty of the Cuyahoga County Common Pleas Court, so that he could review the application.  (*Id.*)  Judge McGinty reviewed the application and signed the search warrant, which expressly authorized execution of the warrant at any time – "making search in the day or night season."  (Habeeb Dep. 114:25-115-4; Kraynik Dep. 84:25-85:11; Doc. 63-16.)

The Detectives then returned to Jeffries Avenue, Chappell's and McCloud's street, to conduct surveillance of the house.  (Habeeb Dep. 122:4-17; Kraynik Dep. 87:9-20.)  Detectives Habeeb and Kraynik stated that they wanted to wait for McCloud to come home or to wait until they observed activity in the house before executing the search warrant, so that they did not have to engage in a "dynamic entry," but instead could knock on the door and speak to an adult occupant.  (Habeeb Dep. 122:18-21, 162:5-15; Kraynik Dep. 93:14-94:8.)

At approximately 4:11 A.M., while the Detectives were conducting surveillance on Jeffries Avenue, Cleveland Police dispatcher Tina Wickline called Detective Habeeb's cell phone.  (Doc. 81-6 "The Recorded Telephone Conversation of September 1, 2005").  During this conversation, Wickline and Detective Habeeb discuss the following:  (1) McCloud's prosecution in Juvenile Court, in which Detective Habeeb states that McCloud robbed "15 pizza guys . . . with the same MO . . . and was nice enough to get by on probation" and that "the day he got off house arrest he started robbing people with

the same MO right down from his house"; (2) that Detective Habeeb now sees a light on "in his bedroom";[6] (3) that if Wickline heard Detective Habeeb "out of breath and barely audible, then you [Wickline] know he's running"; and (4) in response to Wickline's suggestion that Detective Habeeb should "just shoot to kill," Detective Habeeb replies, "absolutely." (*Id.*)

Then, at approximately 4:45 A.M., Detectives Habeeb and Kraynik state that they saw a black male, who was later identified as McCloud's uncle, Melvin Chappell, come out of the house at 7712 Jeffries Avenue and take garbage to the street. (Habeeb Dep. 139:19-141:23; Kraynik Dep. 94:9-17.) While Melvin Chappell denies taking the trash out (M. Chappell Dep. 63:6-64:8, May 24, 2007), the Detectives claim that they made the decision to execute the search warrant only after they observed activity in the house. (Habeeb Dep. 139:19-141:23; Kraynik Dep. 94:9-17.)  The Detectives then notified a supervisor, Sergeant Rick Mahruniak, regarding their intent to execute the warrant and to request his supervision, as well as backup from uniformed officers. (Habeeb 123:19-126:3; Kraynik Dep. 96:4-8.)  According to the Detectives, however, Sergeant Mahruniak advised them that a double homicide had just occurred that required all supervisors and available patrol officers to search for a murder suspect.  (Habeeb Dep. 125:15-18; Kraynik Dep. 96:9-15.)  Eventually, however, two uniformed officers – Officer Shawn Smith and Officer Marcus Jones – were able to respond to the Detectives' location and assist with the execution of the warrant. (Habeeb Dep. 146:13-149:9; Kraynik Dep. 96:9-15.)

---

[6] Both Detectives Habeeb and Kraynik stated in their depositions that they later realized that a light was not on in the house, but instead what they saw was merely a reflection of a street light on the house.  (Habeeb Dep. 130:5-132:6; Kraynik Dep. 92:24-93:3.)  The Detectives testified that they did not believe McCloud was in the house on Jeffries at any time on the morning of September 1, 2005 until they came upon him in his bedroom.  (Habeeb Dep. 123:6-8, 149:17-21; *see* Kraynik Dep. 93:14-94:17, 98:17-99:5; Jones Dep. 12:21-24.)

Once the uniformed officers arrived on the scene, Detective Habeeb briefed them on the situation and provided them with a photo of McCloud. (Habeeb Dep. 149:11-21.) While the Detectives did not believe that McCloud was at the residence, they instructed both officers to secure the perimeter of the home and to detain anyone who may flee the house, so that they may be questioned.  (*Id.*)

After this brief consultation, the Detectives and the two uniformed officers approached the house to execute the search warrant. (Habeeb Dep. 150:17-152:9.)  Officer Smith went to secure the rear or southeast corner of the house near the garage (Smith Dep. 9:4-10:11, June 4, 2007), and Officer Jones went to secure the front or northwest corner of the house near the front porch (Jones Dep. 13:14-19).  Detectives Habeeb and Kraynik, dressed in plain clothes but outfitted with ballistics vests that were marked "POLICE" on the front and back, went onto the porch and knocked on the front door. (Habeeb Dep. 150:17-152:19; Kraynik Dep. 96:24-97:5.)

Melvin Chappell, who testified that he awoke shortly after 5:00 A.M. on the morning of September 1, 2005, as was his custom, heard the Detectives' knock and answered the door.  (M. Chappell Dep. 62:16-63:5.)  The Detectives advised him that they had a search warrant for the house. (Habeeb Dep. 153:4-7; Kraynik Dep. 98:17-18; M. Chappell Dep. 64:17-24.)  Melvin Chappell asked several times for a copy of the warrant, but the Detectives said they would not provide him with a copy until they had cleared the premises.  (Habeeb Dep. 154:16-20; Kraynik Dep. 97:24-98:16; M. Chappell Dep. 64:18-24.)

The parties then dispute what happened next.  The Detectives insist that Detective Kraynik asked Melvin Chappell several times who else was in the house, and that Melvin Chappell responded that only his mother was in the house and that she was getting ready for work.  (Habeeb Dep. 153:13-15, 162:25-163:6; Kraynik Dep. 98:17-99:5, 99:25-100:3.)  By contrast, Melvin Chappell denied that

the Detectives ever asked who was present in the house.  (M. Chappell Dep. 66:5-12.)  It is undisputed, however, that Detective Kraynik never specifically asked whether McCloud was home (Kraynik Dep. 98:24-99:5), and that Melvin Chappell never informed the Detectives about McCloud's whereabouts. (M. Chappell Dep. 66:5-12).

Next, after this brief interaction with Melvin Chappell at the door, the Detectives entered the house and began a "protective sweep" of the residence.  (Habeeb Dep. 156:3-157:7; Kraynik Dep. 103:22-104:8; M. Chappell Dep. 72:10-73:8.)  Meanwhile, Officer Jones stepped onto the front porch, stayed with Melvin Chappell, and prevented him from entering the house.  (Jones Dep. 16:12-16; M. Chappell Dep. 70:23-72:17.)  Also at that time, Dorothy Chappell, the Plaintiff, exited the rear of the house to leave for work and was detained by Officer Smith near her car in the garage.  (Smith Dep. 10:22-13:23.)

The Detectives began their protective sweep of the house by securing the living and dining rooms on the first floor of the home and then proceeding upstairs and down the upstairs hallway, clearing rooms along the way. (Habeeb Dep. 170:3-177:17; Kraynik Dep. 103:22-109:19.)  During the sweep, Detectives Habeeb and Kraynik had their guns drawn and were each carrying flashlights. (Habeeb Dep. 169:17-170:2; Kraynik Dep. 100:9-10, 115:19-22.)  Other than the light illuminating from their flashlights and a few night lights, the house, hallway, and initial upstairs rooms were dark. (Habeeb Dep. 171:20-21; Kraynik Dep. 113:4-13; M. Chappell Dep. 72:18-22.)

During the course of the sweep, the parties dispute whether the Detectives were announcing themselves as "Cleveland Police."  Detectives Habeeb and Kraynik both testified that they repeatedly stated "Cleveland Police" in a command voice to announce their presence.  (Habeeb Dep. 166:14-168:13; Kraynik Dep. 104:2-106:1, 113:17-114:10.)  By contrast, Melvin Chappell testified that he

9

never heard the Detectives yell or announce "Cleveland Police" as they went through the home, despite standing on the porch near the open front door.  (Chappell Dep. 73:9-18.)  Also, Officer Jones, who was standing with Melvin Chappell on the porch, did not recall hearing the Detectives yell "Cleveland Police" prior to gunshots being fired, but Officer Jones did note that, during this time, he was dealing with Melvin Chappell, who was trying to get back into the house.  (Jones Dep. 18:20-20:5.)  Officer Jones testified that his only recollection of hearing the Detectives yell during the execution of the search warrant was after shots had been fired, when he could hear them clearly.  (Jones Dep. 21:8-18.) Finally, Officer Smith, who was in the rear driveway talking with Dorothy Chappell, did not recall hearing any announcements by the Detectives until after shots were fired – but that was shouting that he believed was coming over his police radio – because "it would have been hard to hear coming from the house."  (Smith Dep. 10:22-13:3, 14:3-15:3.)

Nevertheless, after clearing the initial upstairs rooms, the Detectives eventually came to a closed door at the end of the hallway – the door that led to McCloud's bedroom.  (Habeeb Dep. 177:19-24; Kraynik Dep. 111:11-113:2.)

## B.      The Detectives' Use of Deadly Force On September 1, 2005

Both Detectives Habeeb and Kraynik testified that the entire shooting incident in McCloud's bedroom happened extremely quickly.[7]  (Kraynik Dep. 117:9-11; *see* Habeeb Dep. 187:3-11.)

Upon reaching the closed door at the end of the upstairs hallway, the Detectives assert that they again announced "Cleveland Police" to communicate their presence.  (Habeeb Dep. 177:19-24; Kraynik Dep. 114:1-4.)  Detective Habeeb then attempted to open the door, but it stopped less than halfway and

---

[7]  Detective Kraynik testified, "Everything happened real, real fast.  We're sitting here [during a deposition], we're trying to break it down, but it happened in seconds."  (Kraynik Dep. 117:9-11.)

began to bounce back because there was a mattress on the floor.  (Habeeb Dep. 177:19-24, 181:22-182:2; Kraynik Dep. 114:3-18.)  Detective Habeeb, however, stated that he was committed to entering the room at that point.  (Habeeb Dep. 181:24.)  Detective Habeeb then lowered the right side of his body to push the door open further, and he was able to open it enough to get by the door.  (Habeeb Dep. 181:25-182:2.)  Detective Habeeb stated that he moved quickly out of the doorway and stepped over the mattress to the right in compliance with his training to avoid being in the "fatal funnel."[8]  (Habeeb Dep. 177:18-179:9, 181:25-185:19.)  At that moment, Detective Habeeb saw a male, later identified to be McCloud, standing in the closet of the room.  (Habeeb Dep. 185:16-186:2.)  Detective Habeeb moved further into the room to put the greatest distance possible between himself and McCloud. (Habeeb Dep. 190:7-11.)

Simultaneously, Detective Kraynik entered the room behind Detective Habeeb.  (Kraynik Dep. 114:11-18.)  Detective Kraynik moved straight into the room and moved over as far to the left as he could.  (Kraynik Dep. 114:11-115:3.)  Once in the room, Detective Kraynik also saw the male, later identified to be McCloud, standing in the closet.  (Kraynik Dep. 116:16-25.)

It is undisputed that the mattress lay between the Detectives and McCloud, and that the Detectives were separated from the suspect by about 81 inches, or seven feet.  (Habeeb Dep. 190:20-191:12.)

---

[8]  Detective Habeeb testified:

Fatal funnel is when you have a closed space, especially doorways are considered fatal funnels.  As you move through a doorway you are – your position is fixed as you come through the doorway so if somebody is on the other side where you can't see them, they know you're coming through the door and they can shoot in that general direction and you're at greater risk of being assaulted or hurt.  It's taught.

(Habeeb Dep. 178:2-10.)

Upon observing McCloud in the closet, Detective Habeeb stated that he immediately shouted commands for McCloud to come out of the closet and show his hands.[9]  (Habeeb Dep. 191:14-21.)  At that point, the Detectives stated that McCloud suddenly turned towards them and moved out of the closet with a knife in his right hand, blade up, pointed toward the ceiling.  (Habeeb Dep. 191:22-194:15; Kraynik Dep. 119:4-120:20.)[10]  Detective Habeeb then quickly commanded McCloud to "drop the knife, drop the knife" and Kraynik yelled, "knife."  (Habeeb Dep. 191:21-194:15; Kraynik Dep. 119:4-120:20.)  McCloud, however, according to the Detectives, did not drop the knife and continued to move forward out of the closet to a position at the edge of the mattress, which  was all that separated him from them, and that he appeared prepared to continue to move toward them.[11]  (Habeeb Dep. 196:1-

---

[9]  Detective Habeeb testified:

A.  As soon as I became aware of him, I considered him a threat.  I turned and faced him and put distance between us until I couldn't anymore.  I was giving verbal commands.

Q.  What were your commands?

A.  I believe I ordered him to come out of the closet.  Put his hands up.  Repeated the order to him to show his hands.  He presented a threat.

(Habeeb Dep. 191:14-22.)

[10]  The Detectives' blood spatter expert, Lee Ann Singley, concludes, from her analysis of the blood patterns on the blade that the knife had to have been horizontal to the floor when it came in contact with the blood, and that this most likely occurred when the knife was being held such that the "blade runs longitudinally."  (Doc. 63-10.)  The testimony of the Detectives is unequivocally contrary to this, however, describing the knife blade as pointing vertically toward the ceiling when McCloud exited the closet.

[11]  Detective Habeeb testified in part:

Q.  So his body came forward?

A.  Yes.

Q.  How far did it come forward?

12

_____

A.  I can't say.

Q.  What was the movement?

A.  He moved forward.

Q.  Can you describe it?

A.  As he was almost lunging forward.
. . . .

A.  He moved forward, enough to make me believe he was a deadly threat.

Q.  I want to know physically what he did?

A.  He came forward.

Q.  Did he take a step toward you?

A.  He came forward.  I can't tell you how many steps, what kind of steps.  He came forward.
. . . .

A.  He stepped toward the bed.

Q.  Did he take a step on the bed, that you could see?

A.  Not that I could see.  He came forward as if he was crossing on the bed and that's when I fired.
. . . .

Q.  Can you tell me how far he moved?

A.  He moved from the closet to the bed and was coming forward.  I cannot tell you in distance.

(Habeeb Dep. 196:8-197:24.)

Detective Kraynik testified in part:

Q.  What happened after you said, show your hands?

198:16;  Kraynik  Dep.  119:4-120:20,  161:1-163:24.)    Then,  both  Detectives  simultaneously  shot

A. Brandon McCloud turned toward me.

. . . .

A. Brandon McCloud turned forward and I observed the knife in his right hand.  He came forward, came forward at us, and that's when I began to fire.  I'm sorry, let me clarify.  Take a step back.  As he made his initial turn, in the split second after I saw the knife I screamed something like, knife.  It was immediately after that Brandon McCloud came forward.

(Kraynik Dep. 119:4-7.)

Detective Kraynik also testified:

A. When I first saw Brandon McCloud I started saying, come on out, come out with your hands up.

. . . .

A. Very quickly Brandon McCloud turned, faced us, faced forward.

. . . .

Q. Towards you, and the knife was still in his hand pointed upwards?

A. Yes, it was.

. . . .

A. I fired when Brandon McCloud moved forward and perceived a threat to my life.

. . . .

Q. Did you see Brandon take a step in your direction?

A. Brandon McCloud came forward.  I perceived he was coming right at me.

Q. Did he take a step forward?

A. He came forward.

Q. One or two steps forward?

A. I don't know, sir.

(Kraynik Dep. 161:14-163:18.)

14

McCloud, and McCloud fell back to his left into the closet.  (Habeeb Dep. 201:12-204:20; Kraynik

Dep. 119:4-120:24.)  Detective Habeeb fired six shots, and Detective Kraynik fired four (Kraynik Dep.

120:25-121:10).  It is undisputed by all the witnesses who heard the shooting that these shots were

delivered in a single volley of shots, fired in rapid succession.  (Habeeb Dep. 203:2-13; Kraynik Dep.

123:5-12; M. Chappell Dep. 80:15-25;  *see* Jones Dep. 22:9-14; Doc. 63-6 at 7.)

**C.**     **The Events After The Detectives' Use of Deadly Force On September 1, 2005**

After the shooting, the Detectives approached McCloud to see if they could render first aid.

(Habeeb Dep. 203:14-205:12; Kraynik Dep. 124:15-19.)  When it became clear they could not help

McCloud, Detective Habeeb began to broadcast on his police radio that shots had been fired and that

paramedics and additional police assistance were needed.  (*Id.*)  The Detectives then realized that,

despite what just happened in the bedroom, they had not checked the remainder of the house for

additional suspects.  (Habeeb Dep. 206:3-13; Kraynik Dep. 124:19-125:19.)  So, the Detectives walked

downstairs, told Officer Jones to hold his position at the front door, and quickly scanned the kitchen

and basement.  (Kraynik Dep. 124:19-125:19.)  Then, after clearing the house, Detectives Habeeb and

Kraynik walked outside the house and separated until supervisors and additional police personnel

arrived.  (Habeeb Dep. 206:3-19; Kraynik Dep. 124:19-125:19.)

Then, shortly after supervisors and additional police personnel arrived, a resident of Jeffries

Avenue named Mark Williams observed one of the Detectives talking on his cell phone saying, "It's

a fatality.  I f***ed, I f***ed up."  (*See* Williams Dep. 58:13-17, 108:2-8, June 21, 2007.)  Williams,

after seeing pictures of the Detectives on television, later identified Detective Habeeb as the person on

the cell phone.  (*See* Williams Dep. 73:21-75:25, 108:11-109:21, 118:19-120:14.)  Detective Habeeb,

while admitting he talked on his cell phone shortly after the shooting (Habeeb Dep. 209:2-10), denies

15

making the statement that Williams attributes to him (Habeeb Dep. 214:13-15).[12]

**D.     Summary Of The Cuyahoga County Coroner's Investigation Of The Shooting**

The Cuyahoga County Coroner's Office conducted an independent investigation of the shooting under authority of law and submitted several reports, including an autopsy report, toxicology report, Trace Evidence Report, and DNA analysis. (Doc. 64.) First, the autopsy report confirmed that McCloud received ten bullet wounds. (Doc. 64-4.) All ten of the bullets traveled from front to back at differing angles and positions. (*Id.*) Second, the toxicology report detected the presence of cannabinoids (marijuana) in McCloud's blood system. (Doc. 64-5.) Third, a crime scene visit by the Coroner's Office described in the Trace Evidence Report revealed that two knives were discovered in McCloud's bedroom, including one that was near McCloud's body on the floor in front of the closet with a blood stain pattern across the knife blade. (Doc. 64-6.) And fourth, DNA analysis of the knife blade confirmed that the blood was attributable to McCloud. DNA analysis of the knife handle, however, revealed that there were multiple "contributors" to the material profiled there, and that neither McCloud nor either of the Detectives could not be excluded as possible contributors. (Doc. 64-7.)

In addition to the above-mentioned reports, the Coroner's Office, at the request of the McCloud family and their attorney, also retained an independent blood spatter expert, Mr. Toby L. Wolson, to conduct an analysis of the blood spatter in McCloud's bedroom and on the knife blade. (Doc. 65-3.) In his report, Wolson reached the following conclusions:

---

[12] Chappell makes much of this statement, classifying it as "an excited utterance" that she says constitutes an "admission against interest." The Court puts no weight on this proffered evidence, however. Even if the statement were made – a point about which there is clear debate – it is just as likely a statement of remorse about having been forced by circumstances to participate in a justifiable use of force as it is an admission that the force was excessive. Any officer would be distraught over the use of deadly force, whether forced into it or not.

(1) The bloodstain patterns observed in the northwest bedroom are consistent with the blood source being located in front of and inside the closet while the blood was being deposited on the bedding, bedroom floor, bedroom walls, closet door, closet walls, closet floor, and footwear in the closet;

(2) The bloodstain patterns on the bedding are consistent with the blood source being above the west side of the bed at the time that the blood was deposited on the bedding;

(3) No bloodstain patterns were observed that would indicate the blood source was in or on the bed at the time that the blood was deposited on the bedding, bedroom floor, bedroom walls, closet door, closet walls, and footwear in the closet; and

(4) The blood flow pattern on the knife blade indicates that the orientation of the knife blade was vertical (perpendicular to the floor) when the blood was deposited on it.

(*Id.*) Consequently, Wolson testified in his deposition that the bloodstain pattern evidence showed that McCloud was not confined entirely to the closet, but was standing outside the closet "close to the bed."[13]  (Wolson Dep. 77:21-78:18.)  Further, in regards to the knife blade, Wolson testified that

---

[13]  Wolson testified:

Q. And so, therefore based upon this conclusion [conclusion #1 above], you can confirm that Mr. McCloud was not confined entirely to the closet?

A. It appears that he had to be – to get the blood on the bed top, which is another one of the conclusions [conclusion #2 above], he had to be close to that bed, because it appears to be blood dripping down on it.  So in order for that to happen, that would be consistent with him standing possibly outside the closet.

Q. Okay.  And also the blood spattered on the north wall is consistent with that location outside the closet?

A. It is consistent that at the time some of that blood was spattered there, he could have been outside the closet, yes.

Q. And is it fair to say then, to a reasonable degree of certainty, that he was not confined entirely to the inside of the closet?
A. The blood says that he could have been outside the closet, yes.  So he was not confined to only the inside of the closet.

(Wolson Dep. 77:21-78:18.)

17

because the blood flow pattern ran across the blade and was caused by gravity, the knife had to be held by a person or propped up against some other vertical surface on its edge, with the sharp, curved edge of the knife blade facing up or down.  (Wolson Dep. 84:6-88:11, 92:15-97:22.)  In this regard, however, Wolson stated that it did not appear that there was anything in the immediate vicinity of the knife on the ground that would have been able to prop the knife up and had the corresponding blood stains that would be consistent with this alternative explanation.  (Wolson Dep. 92:15-97:22.)  Accordingly, Wolson testified that the alternative scenario was "highly unlikely," and that the more likely scenario or reasonable explanation was that McCloud was holding the knife in his hand.[14]  (Wolson Dep. 97:6-22.)

## E.    Summary Of The Detectives' Bloodstain Pattern Expert Report

The Detectives' bloodstain pattern expert, Lee Ann Singley, also conducted a study and examination of the area surrounding the knife blade to determine whether it was possible that the knife

---

[14]  Wolson testified:

Q. There is no other – based on the location where the knife is on the ground in front of the closet, there was nothing in the immediate vicinity that would have allowed it to be propped up?

A. Well, let's say it is against the wall, propped against the wall, prior to being put in this position.  That could explain it too.  But because I don't see a bloodstain on the carpet anywhere nearby that is consistent with that, I would say that is a highly unlikely scenario.

Q. Okay.  There wasn't anything else that could explain it, other than – the most likely scenario was that it was held in the hand?

   Mr. Gilbert: Objection.

A. That is a reasonable explanation.

(Wolson Dep. 97:6-22.)

was not in McCloud's hand when the blood flow pattern was formed.  (Doc. 63-10.)  While she concluded that the blade had to have been positioned horizontally, not vertically, when the blood was deposited, like Wolson, she concluded that the most likely scenario is that the knife was being held at the time it was exposed to the blood spatter.  More specifically, Singley failed to find bloodstains on any potential vertical surfaces in the immediate vicinity of the knife that could have held the knife blade up on its edge, and, instead, observed a small, elongated stain on the carpet next to the knife blade that was of the same width as the blood flow pattern on the knife.  (Doc. 63-10 at 6.)  According to Singley, this bloodstain, along with the lack of any potential props, provides further objective evidence to support the conclusion that the knife was held in McCloud's hand and that the corresponding elongated bloodstain occurred when the edge of the knife blade "struck the floor."  (*Id.*)

**F.      Summary Of Chappell's Expert Report**

Chappell's ballistics and blood spatter expert, David E. Balash, also prepared a report offering a number of opinions regarding the shooting.  In his report, Balash reached the following opinions:

(1) The blood on the knife was deposited while the knife was positioned against another object, and the blood was deposited while the knife was in a static position, not moving, and further there is no way to determine forensically whether the knife was actually in Brandon McCloud's hand at the time of the shooting or somewhere else in the room;

(2) The victim received a number of shots while he was on the floor of the closet leaning forward which is inconsistent with the Detectives' version claiming the shooting ceased before he fell to the floor;

(3) The wounds inflicted on the victim – based on the autopsy and bullet identifications – do not correspond and cannot be explained by the version offered by the Detectives; and

(4) The ejection patterns of the spent cartridges indicate the weapons were pointed downward when fired.

(Balash Aff. at ¶ 3.)

The Detectives challenge a number of Balash's opinions.  Citing Balash's deposition testimony,

19

the Detectives note the following.  First, Balash does not dispute that "McCloud would have come out of the closet and moved to the edge of the mattress."  (Balash Dep. 190:5-16, Oct. 2, 2007.)  Second, the Detectives assert that, while Balash believed that the knife "has to be against something" for the blood stain pattern to have appeared across the blade, Balash stated that the knife was found outside of the closet and that he did not see "anything in the immediate vicinity where the knife was found that actually would have allowed it to be propped up."  (Balash Dep. 187:2-188:10.)  Thus, according to the Detectives, Balash admitted that he could not rule out the possibility that the "blood was deposited on the knife at the time it was being held" (Balash Dep. 189:21-25) and therefore could not state to a reasonable degree of scientific certainty that the knife was not held in McCloud's hand "if it [was] touching something else" (Balash Dep. 188:17-21).  And third, the Detectives assert that Balash's opinion that some of the bullets may have entered McCloud's body when he was in a seated position on the floor of the closet (Balash's second opinion above) is an unsubstantiated counter-narrative of the shooting.  The Detectives contend that Balash admitted that, even under his theory, at least 3-5 shots were fired when McCloud was in an "upright position," (Balash Dep. 223:15-24) and that those shots "would have had to have been" the "first shots" fired by Detectives Habeeb and Kraynik (Balash Dep. 221:20-222:6, 249:19-250:5).  Further, Balash did not dispute that all of the shots were fired simultaneously by both officers firing at the same time (Balash Dep. 250:6-10) and "would have occurred within a single volley of shots as all the eyewitnesses have testified" (Balash Dep. 254:19-22).  Thus, the Detectives conclude that, while Balash did not develop a comprehensive analysis of the shooting that accounted for and reconciled the various positions and angles of all 10 bullet wounds (Balash Dep. 195:8-196:11), Balash admitted that all of the wounds occurred "during this single volley of shots" via a process whereby McCloud was "outside the closet" and then "ends up falling somewhere

from outside to inside the closet" (Balash Dep. 256:15-25).

**G.     Sergeant O'Bryant's Report**

After the shooting, the City of Cleveland, through its Office of Professional Standards ("OPS"), ordered an investigative report to determine if there were any departmental rules violations committed by Detectives Habeeb and Kraynik.  Sergeant Henry O'Bryant, a 21-year veteran of the Cleveland Police Department, conducted the review and concluded that the Detectives violated a number of departmental rules.  Chappell asserts that Sergeant O'Bryant's report demonstrates factual inconsistencies regarding the Detectives' justification for the shooting and points out "genuine disputes" between other witnesses' accounts and that of the Detectives regarding critical aspects of the encounter with McCloud.  (Doc. 81 at 29.)  The Detectives, on the other hand, argue that Sergeant O'Bryant's report is a "red herring" and is not relevant to the constitutional issue presented.  (Doc. 84 at 20.)[15]  Thus, the Detectives conclude that Sergeant O'Bryant's report and his deposition testimony are inadmissible, irrelevant, and immaterial to the resolution of this motion.  (*Id.*)

### III. LAW & ANALYSIS

**A.     Standard Of Review**

The Detectives have filed a joint motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Rule 56(c) governs summary judgment motions and provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

---

[15]  The Detectives also contend that Sergeant O'Bryant's report should be discounted both because he was operating under multiple conflicts of interest which dramatically undercut his account and conclusions, and because his conclusions were neither based on first-hand knowledge nor any particular area of expertise and are, thus, inadmissible.  (Doc. 84 at 15 n.8, 16-17.)

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> (1) *In General*.  A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.
>
> (2) *Opposing Party's Obligation to Respond*.  When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Singfield v. Akron Metropolitan Housing Auth.*, 389 F.3d 555, 560 (6th Cir. 2004).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.     Chappell's Fourth Amendment Excessive Force Claim Under § 1983**

Chappell claims that Detectives Habeeb and Kraynik used excessive force in violation of the Fourth Amendment when the Detectives shot and killed McCloud. This claim arises under 42 U.S.C. § 1983, which requires a plaintiff to "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (omitting citations). Here, the Detectives do not dispute that they acted under color of state law during their encounter with McCloud. Accordingly, to succeed on her claim, Chappell must show that the Detectives deprived McCloud of his Fourth Amendment right to be free from excessive force.

**1.     Qualified Immunity**

The Detectives, however, assert that qualified immunity insulates them from Chappell's excessive force claim under § 1983 and move for summary judgment on that ground. Where applicable, the doctrine of qualified immunity protects government officials, including police officers,

from § 1983 claims.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pierson v. Ray*, 386 U.S. 547 (1967) (establishing that police officers may claim qualified immunity from suits brought under § 1983).  In general, qualified immunity applies when government officials' conduct in performing discretionary functions "does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.

The goal of qualified immunity is to "avoid excessive disruption of government" by protecting public officials' ability to exercise their discretion without undue fear of civil liability.  *Id.*  In particular, "police officers are entitled to qualified immunity unless, 'on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the conduct was unlawful] . . . .'"  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  When a police officer invokes qualified immunity, the burden is on the plaintiff to demonstrate that the officer is *not* immune.  *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

### i.      The *Saucier* Test For Qualified Immunity

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test for evaluating a qualified immunity defense in the context of an excessive force claim arising under § 1983.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  *Id.*  A motion for summary judgment on qualified immunity grounds must be

24

granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[16]

**a.**     **Prong One:  Whether the Detectives' Conduct Violated McCloud's Fourth Amendment Right To Be Free From Excessive Force**

Under the first prong of *Saucier*, a district court must determine whether the defendant's conduct violated a constitutional right.  533 U.S. at 201.  In making this determination, a court must construe the evidence of a constitutional violation in the light most favorable to the plaintiff.  *Id*. Therefore, even where the facts are disputed, if the plaintiff's version of the facts does not rise to the level of a constitutional violation, then the first prong has not been satisfied and qualified immunity applies.  *See Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).  Conversely, if "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," a district court

------

[16] Various panels of the Sixth Circuit have broken the two-prong *Saucier* test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996))).  As the Sixth Circuit explained in *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005), the first two prongs mirror the two prongs of the *Saucier* test, and the third prong acknowledges the reasonableness requirement that is implicit in the clearly established prong as explained in *Saucier*. Judge Karen Nelson Moore clearly prefers the three-prong approach.  *Myers v. Potter*, 422 F.3d 347, 358-59 (6th Cir. 2005) (Moore, J., concurring).

Other panels have held that, while the three-prong test may be correct, it is unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is objectively unreasonable."  *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006).

In this case, the Court finds that the latter approach is sufficient.  Indeed, neither party even discusses the three-prong approach.  Accordingly, the reasonableness of the Detectives' conduct is discussed below in connection with the second prong of the *Saucier* test.

should not grant immunity.  *Murray-Ruhl v. Passinault*, 246 Fed Appx. 338, 343 (6th Cir. 2007) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989)).  In other words, when the plaintiff's evidence, viewed in the most favorable light, amounts to a constitutional violation, prong one of the *Saucier* test is satisfied *even if the facts pertinent to the alleged constitutional violation are disputed.  See Turner*, 119 F.3d at 428.

Here, as noted, Chappell alleges that the Detectives' use of deadly force in effectuating the "seizure" of McCloud violated his Fourth Amendment right to be free from excessive force.  It is axiomatic that individuals have a constitutional right not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person.  *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989).  A claim that the government used excessive force during the course of a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Id.*  In *Graham*, the Supreme Court established the test for analyzing objective reasonableness:

> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.

*Id.* at 396.  Application of this test "requires careful attention to the facts and circumstances of each particular case, including the [1] severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."[17]  *Id.*  Further, the "reasonableness" of a particular use of force

---

[17]  *See St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (noting that reviewing courts should consider the three factors identified in *Graham* when evaluating excessive force claims, but also recognizing that those factors "did not constitute an exhaustive list").  As discussed below, the parties focus only on the second factor in their briefs – presumably because the first and third factors are not particularly pertinent to resolving Chappell's claim.  In this regard, the Court notes that the first factor – the severity of the crime at issue – is neutral.  While there were allegations of

is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation," *id.* at 397. Indeed, it is not for the Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Moreover, with regard to the constitutionality of an officer's use of deadly force, which also is subject to the objective reasonableness standard of the Fourth Amendment, the Supreme Court has noted that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985); *see Sample*, 409 F.3d at 697 (stating that "only in rare instances may an officer seize a suspect by use of deadly force"); *see also Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat

---

physical force associated with the pizza delivery robbery on the evening of August 31, 2005, the evidence in the record shows that the robbery occurred hours before the Detectives encountered McCloud in his bedroom, and that the Detectives even admitted that they did not have enough evidence to secure an arrest warrant for McCloud as the perpetrator of the robbery. (*See* Habeeb Dep. 97:11-24 (testifying that Lieutenant Connelly informed him that the Detectives did not "have enough information for an arrest warrant because positive identification had not been made on Brandon McCloud because of the disguise.")) Similarly, the Court also notes that the third factor is neutral. There is no evidence in the record that McCloud was actively resisting arrest or attempting to flee, because the Detectives did not provide him with a temporal opportunity to do so.

27

either to the police or members of the public.").

Applying these principles, Chappell attempts to satisfy her burden under the first prong of *Saucier* by arguing that there is ample evidence in the record that demonstrates the Detectives used excessive deadly force and thereby violated McCloud's Fourth Amendment rights.  More specifically, Chappell asserts primarily four arguments that would preclude summary judgment in favor of the Detectives at step one of the qualified immunity analysis:  (1) upon analyzing the totality of the circumstances as to the Detectives' investigation of the pizza delivery robbery on August 31, 2005 and September 1, 2005, a reasonable jury could conclude that the Detectives' actions were objectively unreasonable; (2) a genuine issue of material fact exists as to whether McCloud was holding a knife when the Detectives used deadly force; (3) a genuine issue of material fact exists as to whether, even if McCloud was holding a knife when he was shot, the Detectives had probable cause to believe that he posed a threat of serious harm to them; and (4) a genuine issue of material fact exists as to whether, even if (2) and (3) above are undisputed, the Detectives acted unreasonably because they failed to announce or sufficiently identify themselves as police officers both upon entering McCloud's bedroom and while in his room.

## 1.    Totality Of The Circumstances

First, Chappell contends that, upon examining the totality of the events on the night of August 31, 2005 and the early morning hours of September 1, 2005, a reasonable jury could conclude that the Detectives' use of deadly force was objectively unreasonable.  For example, Chappell argues here that numerous factual disputes and questionable tactics related to how the Detectives obtained the search warrant and then decided to execute the search of the Jeffries Avenue residence at 5:00 A.M. without the presence of a supervisor, taken in the light most favorable to Chappell, indicate that the Detectives

28

used the warrant merely as an unlawful pretext to confront McCloud, and that their decision to do so created the risk of a dangerous encounter.

As correctly pointed out by the Detectives, however, the Sixth Circuit analyzes claims of excessive force in segments, such that a court's review is limited to officers' actions in the moments preceding the shooting and that other actions leading up to that moment are deemed irrelevant.  *See, e.g.*, *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).  As the Sixth Circuit recently announced in *Livermore*:

> The proper approach under Sixth Circuit precedent is to view excessive force claims in segments.  That is, the court should first identify the 'seizure' at issue here and then examine 'whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.'

476 F.3d at 406 (quoting *Dickerson*, 101 F.3d at 1161).  The Sixth Circuit therefore instructs that the determination of qualified immunity should "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force."  *Id.* at 407.  Accordingly, Chappell's initial contention that the factual disputes related to how the Detectives' obtained the search warrant, decided to execute the warrant in the dark early morning hours without a supervisor, and insisted on entering the home immediately rather than ask Melvin Chappell to assist them in alerting and vacating the home's occupants, could lead a reasonable juror to conclude that the Detectives' use of deadly force was objectively unreasonable is not well-taken; these events identified by Chappell leading up to the moments preceding the shooting are not material to the resolution of an excessive force claim under the foregoing binding Sixth Circuit precedent.

### 2.    Whether McCloud Was Holding A Knife

Second, Chappell asserts that, even under the Sixth Circuit's segmenting approach, there is a genuine issue of material fact regarding whether McCloud was holding a knife at the moment when the

Detectives used deadly force.  In this regard, Chappell first submits the expert report of David E. Balash, who opined that "there is no way to determine forensically whether the knife was actually in McCloud's hand at the time of the shooting or somewhere else in the room."  (Balash Aff. at ¶ 3.) Chappell also suggests that, based on DNA analysis of the knife handle revealing that McCloud and both Detectives could not be excluded as possible contributors to the mixture, there is no way to remove the possibility that the knife was moved after the shooting.

In response, the Detectives implicitly recognize that the issue of whether McCloud was holding a knife is indeed a "material" issue – as they must, given that "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect."  *Sample*, 409 F.3d at 696 (citing *Garner*, 471 U.S. at 11).  Instead, the Detectives argue that Chappell has failed to satisfy her burden of showing that a "genuine issue" exists sufficient to establish that McCloud was not holding a knife.  The Detectives contend that there is overwhelming evidence that McCloud was in possession of a knife, because (1) both Detectives Habeeb and Kraynik testified that they simultaneously fired their weapons upon observing a suspect come out of the closet with a knife; (2) it is undisputed that a knife was found near McCloud's body with a blood stain that DNA testing confirmed was McCloud's blood; (3) the knife had a blood stain pattern that was consistent with a gravity flow pattern that showed that the knife was not lying flat on the ground when the blood flowed across the knife's blade; and (4) the Coroner's Office's blood stain pattern expert, Toby Wolson, testified that the physical evidence was consistent with the Detectives' testimony that the knife was held by McCloud in his hand.  And, in the face of this overwhelming evidence, the Detectives argue that the evidence presented by Chappell's expert, Balash, who actually concedes that he cannot prove that McCloud was not holding a knife and admitted that he could not rule out the possibility that the "blood was deposited on the knife at the time

30

it was being held" (Balash Dep. 189:21-25), is insufficient to establish a "genuine issue" under relevant Sixth Circuit precedent. Further, the Detectives contend that there is no affirmative evidence to establish that the knife was moved subsequent to the shooting.

The Court, upon a review of the parties' arguments and the relevant case law, agrees with the Detectives that Chappell has not satisfied her burden of showing that a "genuine issue" exists sufficient to establish that McCloud was not holding a knife at the moment when the Detectives used deadly force. *See, e.g.*, *Lewis v. Adams County*, 244 Fed. Appx. 1 (6th Cir. 2007); *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000). For example, in *Lewis*, the Sixth Circuit addressed whether an affidavit submitted by the plaintiff's expert created a "genuine issue" as to whether the suspect was armed and pointing his rifle at the officers when they used deadly force. 244 Fed. Appx. at 9-10. Although the plaintiff's expert opined that it was "highly unlikely" that the suspect was pointing a rifle at the officers, the Sixth Circuit still held that the officers were entitled to qualified immunity, because the expert testimony was not sufficient to satisfy plaintiff's burden of proof and "get to a jury" on this issue. *Id.* at 10. The Sixth Circuit concluded that the expert's opinion was insufficient given the officers' testimony and the opinion of the medical examiner:

> One expert's opinion that it is 'highly unlikely' that [the suspect] was pointing his rifle at the officers in the face of the consistent deposition testimony from all of the officers at the scene and the opinion of the medical examiner that the physical evidence was consistent with the officers' testimony is simply not enough to take that issue to a jury.

*Id.*

Similarly, in *Boyd*, the Sixth Circuit addressed: (1) whether the suspect possessed a handgun; and (2) whether the suspect could turn and point his weapon at the officers after being hit with initial gunshots. 215 F.3d at 601-04. First, although the plaintiff argued that the "forensic testing after [the suspect's] death was either inconclusive or negative" as to whether the suspect had possessed a gun,

31

*id.* at 598, the Sixth Circuit rejected this "counter-narrative" as not being based upon "substantial and material evidence" as a matter of law, *id.* at 602.  The Sixth Circuit noted that the testimony of both defendant police officers was supported by objective and reasonable evidence, including the eyewitness testimony of a number of persons.  *Id.*  Therefore, the "various tests (fingerprint, residue, and firearm trace) are inconclusive under the circumstances and are overborne by objective proof that Boyd was armed, or reasonably perceived to be armed, by the police."  *Id.*  Second, the Sixth Circuit rejected the plaintiff's argument that his expert testimony was sufficient to create a genuine issue as to whether the suspect was physically unable to point a gun after being shot.  *Id.* at 602-03.  The Sixth Circuit stated the expert's testimony was merely based on a "probability" that "did not definitively conclude that it would have been impossible for [the suspect] to raise himself up on his arms to aim his weapon again" and was contradicted by the coroner's expert testimony and other objective proof.  *Id.* at 603.  Accordingly, the Sixth Circuit reversed the district court's judgment and granted qualified immunity to both officers.  *Id.* at 603-04; *accord Estate of Sowards v. City of Trenton*, 125 Fed. Appx. 31, 38 (6th Cir. 2005) (holding that the evidence submitted by the plaintiff as to whether the suspect possessed and fired a handgun "amounted to nothing more than a scintilla of evidence" and was therefore insufficient to contradict the officers' testimony and the other physical proving that the suspect had a gun); *see also DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418 , 427 (6th Cir. 2006) (noting that a single expert report that consisted entirely of premises that contradicted the uncontroverted facts was insufficient to create a genuine issue of material fact).

Here, like the plaintiffs in *Lewis* and *Boyd*, Chappell has not presented sufficient evidence as a matter of law to carry her burden of proof that McCloud did not come out of the closet with a knife, as the Detectives have both testified and as the Coroner's Office has stated was consistent with the

32

forensic evidence.  Indeed, as pointed out by the Detectives, Chappell's expert testimony in this case is even less conclusive than the testimony proffered in *Lewis* and *Boyd*.  In *Lewis* and *Boyd*, the plaintiffs' experts at least attempted to make a showing that the respective suspects were neither armed nor pointing a weapon at the officers.  Here, Chappell's expert did not even attempt to establish that McCloud was *not* holding a knife; rather, Balash admitted that "there is no way to determine forensically whether the knife was actually in Brandon McCloud's hand at the time of the shooting." Moreover, the lack of any affirmative evidence that the knife was moved subsequent to the shooting, in connection with the undisputed forensic evidence establishing that the blood flow pattern did not occur when the knife was lying flat on the floor and without "anything in the immediate vicinity where the knife was found that actually would have allowed it to be propped up," (Balash Dep. 187:2-188:10), is insufficient to establish a "genuine issue" as to whether McCloud was holding a knife at the moment when the Detectives used deadly force.

### 3. Whether McCloud Posed A Threat Of Serious Physical Harm

Third, even assuming that McCloud was holding the knife, Chappell argues that a genuine issue of material fact exists with respect to whether McCloud presented a threat of serious harm to Detective Habeeb and Kraynik when the Detectives used deadly force.  The following facts, construed in the light most favorable to Chappell, are pertinent to resolving this issue.

Upon entering the dimly lit bedroom, the Detectives noticed McCloud standing in a closet. Detective Habeeb immediately instructed McCloud to come out of the closet and show his hands. McCloud stepped forward, out of the closet and toward the Detectives.  The distance between McCloud and the Detectives was approximately five to seven feet, and a mattress was lying on the floor between the closet and the Detectives.  At the same time, McCloud raised his right hand which contained a

knife, blade up.[18]  The Detectives commanded McCloud to drop the knife; he did not do so; and they shot him ten times in a single volley.

Based on these facts, the issue is whether a reasonable juror could conclude that the Detectives use of deadly force was objectively unreasonable based on the test for excessive force as stated by the Supreme Court in *Garner*.  471 U.S. at 3, 7 (noting that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others").  To answer this question, the Sixth Circuit instructs us to consider whether a reasonable juror could find that McCloud did not pose "a serious and immediate threat to the safety of others" when he was shot by the Detectives.  *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005).  If a reasonable juror could make such a finding, then the officers may have violated McCloud's constitutional rights when they used deadly force against him.  *See id.*

There is a body of case law that considers the circumstances in which a suspect with a knife poses "a serious and immediate threat."  Courts have stated that "[a]lthough a knife is a deadly weapon, its mere status as such does not create the justification for the use of deadly force."  *Diaz v. Salazar*, 924 F. Supp. 1088, 1094 (D.N.M. 1996); *see also Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007) (Boggs, C.J.) (noting that in Sixth Circuit cases finding that an officer faced a serious and immediate threat from a suspect holding a knife, the suspect in question was brandishing that knife and charging the officers or others).  Indeed, the myriad cases cited by the Detectives illustrate that it is reasonable as a matter of law for an officer to use deadly force only when a suspect is both holding a knife and engaged in some other threatening activity.  *See Mace v. City of Palestine*, 333 F.3d 621, 622-23 (5th Cir. 2003) (finding officers' use of deadly force against a suspect brandishing a sword

_____

[18] No facts are in evidence regarding whether McCloud also raised his left hand.

34

objectively reasonable when the suspect claimed to be an expert in the martial arts, was intoxicated, and was making threatening slashes toward officers eight feet away); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 784-785 (4th Cir. 1998) (finding officers' use of deadly force objectively reasonable when the suspect had been verbally threatening the officers' lives, throwing objects at the officers through a broken window, swinging the knife at the officers, and then began walking toward the officers while holding his knife in a threatening manner, ignoring several warnings to drop the knife and stop approaching); *Romero v. Board of County Comm'rs*, 60 F.3d 702, 704 (10th Cir. 1995) (finding the officer's use of deadly force objectively reasonable when suspect had run a knife across the stomach of the officer and was actively pursuing retreating officer); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (per curiam) (finding officers' use of deadly force objectively reasonable when the suspect wielded two-foot long machete, brandished the machete 4-6 feet from the officers and a third-party, and refused requests to drop the machete); *Woodward v. Brattleboro*, No. 1:02-CV-35, 2006 WL 36906, at *5 (D.Vt. Jan 5, 2006) (finding officers' use of deadly force objectively reasonable when the suspect was a mentally disturbed individual who was acting irrationally while holding a knife in close proximity to many bystanders and disobeying orders to drop his weapon). Conversely, courts have found that it is *not* reasonable to use deadly force against a suspect who is holding a knife but is not engaged in other serious threatening activity. *See Murphy v. Bitsoih,* 320 F. Supp. 2d 1174, 1192 (D.N.M. 2004) (declining to hold as a matter of law that police officers used potentially deadly force when a suspect holding a knife fifteen feet away was merely "taking steps toward, approaching, or closing the distance" between the suspect and police officers); *Herrera v. Las Vegas Metro. Police Dep't*, 298 F. Supp. 2d 1043, 1050 (D. Nev. 2004) (not objectively reasonable as a matter of law to shoot mentally disturbed individual "standing with the knife pointed skyward, stunned, for nearly a full

35

minute").

Ultimately, the governing case law illustrates that this Court must weigh the totality of the circumstances to determine if the Detectives acted reasonably.  In the context of cases in which deadly force was used against a suspect with a knife, the totality of the circumstances test requires the suspect to be engaged in some threatening activity beyond merely holding a knife.  In applying this test, however, the Court is mindful that objective reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Untalan*, 430 F.3d at 315.

The Detectives argue that, once the knife is placed in McCloud's hand and McCloud is placed within 21 feet of the Detectives, the Court's inquiry should end.  The Detectives rely on what they describe as a "21-foot rule" and argue that an individual in the possession of a knife is, by definition, a deadly threat whenever he is within that 21-foot zone.  (Doc. 63 at 26-27.)  The Detectives also assert that the Court must give deference to their perceptions, because the events were "tense, uncertain, and rapidly evolving."  (*Id.* at 27.)

There are several weaknesses in the Detectives' arguments, however.  First, not only is it true that there is no expert evidence in this case supporting the Detectives' 21-foot zone of danger theory or that the Detectives were even aware of the 21-foot rule, but a review of the cases where that theory is discussed reveals circumstances far different from those at issue here and/or that the 21-foot rule played little role in the courts' decisions to grant qualified immunity to the officers. *See, e.g.*, *Sigman*, 161 F.3d at 784-785, 788 (4th Cir. 1998) (finding officers' use of deadly force objectively reasonable when the suspect had been verbally threatening the officers' lives, throwing objects at the officers through a broken window, swinging the knife at the officers, and then began walking toward the

36

officers while holding his knife in a threatening manner, ignoring several warnings to drop the knife and to stop approaching; the court discussed the applicability of the 21-foot rule *only* in the context of the plaintiffs' claims against the police department, the chief of police, and the town); *Estate of Larsen v. Murr*, Case No. 03-CV-02589, 2006 WL 322602, at *3-*5 (D. Colo. Feb. 10, 2006) (finding officers' use of deadly force objectively reasonable when the suspect already had threatened violence against himself and others, the suspect was holding a large knife more than one foot long, both officers repeatedly told the suspect to put down the knife, the suspect refused to comply and raised the knife blade above his shoulder and pointed the tip towards the officers, and the suspect took a step towards the officers and was shot somewhere between 7 and 20 feet apart; the court discussed the applicability of the 21-foot rule *only* in the context of the plaintiff's claim against the city), *aff'd*, 511 F.3d 1255; *Woodward*, 2006 WL 36906, at *5 (relying in part on the 21-foot rule and finding the officers' use of deadly force objectively reasonable, but where the suspect was a mentally disturbed individual who was reported to be threatening a church congregation and was acting irrationally while holding a knife in close proximity to many bystanders and disobeying police orders to drop his weapon). Thus, it was not the mere presence of a knife within a 21-foot zone on which those decisions turned, but the threatening wielding of a knife in that zone, often accompanied by other indicia of an intent to cause harm, which those courts found meaningful.

Second, as the Sixth Circuit has cautioned, the fact that law enforcement officers may be operating in tense or rapidly evolving circumstances, while relevant, does not, by itself, permit the officers to use deadly force. *See Green v. Taylor*, 239 Fed. Appx. 952, 959 (6th Cir. 2007) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005) ("The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force."). Officers often act in such circumstances, but only

in the most rare of those is deadly force justified.  *See Sample*, 409 F.3d at 697 (stating that "only in

rare instances may an officer seize a suspect by use of deadly force").

Third, the Detectives' position fails to take into account that, in the assessment of objective

reasonableness, this Court must view the facts in the light most favorable to Chappell.  *Saucier*, 533

U.S. at 201.  When it does so, it is apparent that there is a genuine issue of material fact regarding the

threat of danger posed by McCloud.  McCloud was not charging the officers, a mattress separated

McCloud from the Detectives, and McCloud was not waving the knife about in a threatening manner

– the knife was pointed upward and was not in a position to directly threaten the Detectives.  Further,

the evidence plausibly suggests that McCloud was merely complying with the Detectives' instructions.

That is, he stepped out of the closest when instructed to do so and raised the knife in response to the

command to show his hands.[19]  Although he did not immediately drop the knife when ordered to do so,

there is no evidence indicating that McCloud had sufficient time to comply.  Indeed, the evidence

suggests that all of the events occurred in rapid succession.

On balance, these facts are not closely analogous to any of the knife cases described above.  In

fact, in all of those  cases finding that deadly force was objectively reasonable in response to a threat

posed by a suspect with a knife, substantially more threatening behavior by the suspect was involved.

While the Court does not wish to underestimate the pressure faced by officers in the middle of a rapidly

evolving and potentially dangerous situation, especially in a small, dimly lit room, this is simply not

a case in which the Court can say, *as a matter of law*, that the use of deadly force was objectively

---

[19]  While the parties debate whether Detective Habeeb's comment that McCloud "appeared to have been lunging" is credible, or is inconsistent with other comments he made on this point, the Detectives ultimately concede in their reply that McCloud simply was "moving forward out of the closet to the edge of the bed" and no more.  (Doc. 84 at 17.)  This also is Detective Kraynik's consistent description of McCloud's movement.  (*See* n.11, *supra*.)

reasonable.  The Court is particularly hesitant to do so, moreover, in light of its conclusion, below, that genuine issues of material fact remain with respect to whether the Detectives announced their presence to McCloud when they entered his bedroom and encountered him.  If the Court assumes, as it must at this stage of the proceedings, that McCloud was not informed that police officers were in his home, and acted in a manner that was not clearly and obviously threatening when encountered, the Court must conclude that the question of objective reasonableness is one appropriately left to the jury.

### 4.      Whether The Detectives Announced "Cleveland Police"

Finally, Chappell asserts that there is a genuine issue of material fact regarding whether the Detectives announced or sufficiently identified themselves as police officers, either prior to entering McCloud's bedroom or while in his room.  Citing *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991), Chappell asserts that, even if the Detectives' actions were otherwise objectively reasonable, their failure to identify themselves recklessly created the circumstances leading to the use of force, making the ultimate use of that force unreasonable and, thus, excessive.

Beginning with the factual question, Chappell argues that she has satisfied her burden of showing that a "genuine issue" exists with respect to whether the Detectives did not announce or identify themselves as police officers.  As noted, both Detectives testified that they repeatedly announced "Cleveland Police" in a loud command voice during the protective sweep of the house and before entering McCloud's bedroom, though neither says they did so once in the room.  By contrast, Melvin Chappell testified that he never heard the Detectives say anything prior to the shots being fired, despite standing on the porch near the open front door.[20]  Melvin Chappell also affirmatively testified that he never heard the Detectives yell or announce "Cleveland Police."  Further, Officer Jones, who

---

[20]  Officers Jones also testified that the front door was open. (Jones Dep. 19:4-12, 20:17-18.)

was standing with Melvin Chappell on the porch, did not recall hearing the Detectives yell "Cleveland Police" prior to shots being fired, but he did recall hearing the Detectives yell *after* shots had been fired. Similarly, Officer Smith, who was in the rear driveway, did not recall hearing any announcements by the Detectives prior to the shots being fired.  Chappell contends that these facts, combined with the fact that it was a warm night on which windows might well have been open (in addition to the door),[21] and it was early enough that the surrounding streets would have been quiet, give rise to a genuine issue of fact regarding whether the officers announced themselves before encountering McCloud.  While the Detectives debate the legal significance of this factual dispute, they do not seriously contend that the dispute is not genuine.

Accordingly, given the testimony of Melvin Chappell and Officers Jones and Smith, the Court concludes that Chappell has met her burden of presenting a "genuine issue," such that a reasonable jury could find in her favor on this issue.  *See Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999) (noting that issues of witness credibility must be resolved in favor of the plaintiff based on the summary judgment standard).  Having found a "genuine issue," the Court must view the evidence in the light most favorable to Chappell and then consider whether the Detectives' failure to announce or identify themselves as "Cleveland Police" is material to the issue of whether the use of deadly force was objectively unreasonable.  Chappell asserts it clearly is, and the Detectives assert it is not.

As noted, Chappell relies on *Yates*, 941 F.2d at 447, a § 1983 excessive force case arising out of a police shooting where the Sixth Circuit affirmed the denial of summary judgment, because the officer entered a dark hallway at a private residence at approximately 2:45 A.M. without identifying himself, without shining a flashlight, and without wearing his hat, and an encounter leading to the use

---

[21]  (*See* Habeeb Dep. 169:11-12; Kraynik Dep. 95:20-96:1.)

of deadly force ensued.  The plaintiff and his brothers found the officer in the dark hallway and thought the officer was an intruder, causing them to knock the officer back through the door and the officer to fire his weapon in response.  *Id.* at 445, 447.  The Sixth Circuit held that such actions on the part of the officer were not "objectively reasonable," and that he thus was not entitled to qualified immunity.  *Id.* at 447.  Further, the Sixth Circuit noted that, although "mere negligence may not serve as a basis for a § 1983 claim," the officer's actions on the night of the shooting were cognizable:  "An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent."  *Id.*; *See also Sledd v. Linsday*, 102 F.3d 282, 288 (7th Cir. 1996) (citing *Yates*,  941 F.2d at 447) ("In a situation where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified."); *Estate of O'Bryan v. Town of Sellersburg*, No. 4:02-CV-238, 2004 U.S. Dist. LEXIS 10160, at *48 (S.D. Ind. May 20, 2004) (citing *Sledd* and *Yates*) (noting, in denying qualified immunity in an excessive force case that "[t]he act of entering a private residence late at night with no indication of identity was enough to show that the officer had unreasonably created the encounter that led to the use of force."); *cf. Bell v. City of E. Cleveland*, No. 96-3801, 1997 U.S. App. LEXIS 28738, at *13-14 (6th Cir. Oct. 14, 1997) (per curiam) (distinguishing acts of mere negligence from the acts in *Yates*).

Applying *Yates* to this case, Chappell argues that the Detectives' failure to announce or identify themselves as "Cleveland Police" when (or even before) they entered McCloud's dark bedroom at approximately 5:00 A.M. caused McCloud to hide in the closet and possibly grab a knife for protection to fend off the possible intruder or intruders he heard rumbling through the house, and that it was this objectively unreasonable behavior on the part of the Detectives that led to the use of deadly force.

41

Therefore, like the defendant officer in *Yates*, the Detectives would not be entitled to qualified immunity on Chappell's § 1983 excessive force claim.

The Detectives, on the other hand, argue that *Yates* is inapplicable to this case for two reasons, neither of which the Court finds persuasive. First, the Detectives claim that *Yates* is distinguishable, because the plaintiff in *Yates* was unarmed. The Detectives contend that the Sixth Circuit in *Yates* found that the officer's actions were the *cause* of the subsequent scuffle with the victim, which resulted in the use of deadly force. And here, the Detectives assert that the officers did not cause McCloud to pick up a knife, hide in the closet, or come out of the closet with a knife, but instead that McCloud's actions constitute a superseding, intervening cause under *Whitlow v. City of Louisville*, 39 Fed. Appx. 297 (6th Cir. 2002).

The Court, however, concludes that the causal connection in *Yates* is not distinguishable from the causal connection in this case. As conceded by the Detectives, the officer's objectively unreasonable actions in *Yates* caused the plaintiff and his brothers to knock the officer back through the door, because they believed the officer was an intruder. This violent response to the officer's actions by the plaintiff and his brothers in turn precipitated the officer's use of deadly force. Here, taking the facts in the light most favorable to Chappell, the Detectives' objectively unreasonable actions similarly may have caused McCloud to take the potentially threatening response of picking up a knife and hiding in the closet, because he believed the Detectives were intruders. And, like the violent response to the officer's actions in *Yates*, this response to the Detectives' actions by McCloud in turn precipitated the Detectives' use of deadly force. Indeed, this reading of *Yates* is consistent with that regularly given to it by other courts who have considered it. *See Sledd*, 102 F.3d at 288 (finding officers' actions objectively unreasonable even though decedent was holding a rifle when officers

42

encountered him); *Estate of O'Bryan*, 2004 U.S. Dist. LEXIS 10160, at *48 (finding that, if the officer failed to sufficiently identify himself, his use of deadly force would be objectively unreasonable even if it is true that decedent held and pointed a handgun at the officer).

Further, the Court concludes that the Detectives' reliance on *Whitlow v. City of Louisville*, 39 Fed. Appx. 297 (6th Cir. 2002), for the proposition that McCloud's intentional act of picking up a knife constituted a superseding, intervening cause is misplaced. The Sixth Circuit in *Whitlow* did not state that the suspect's act of pointing a gun at the officers was an intervening cause in its analysis of the plaintiff's § 1983 excessive force claim, but instead stated that the suspect's act was an intervening cause during its analysis of the plaintiff's *negligence* claim under Kentucky law. 39 Fed. Appx. at 308. The analysis of those two causes of action is materially different and the Detectives attempt to conflate the two portions of that opinion is unpersuasive.

Second, the Detectives assert that *Yates* is inapplicable, because it is inconsistent with the more recent Sixth Circuit decisions in *Livermore* and *Dickerson* that they claim firmly rejects the argument that a police officer can be held liable for allegedly provoking a confrontation that leads to the use of deadly force. On this point, the Detectives go so far as to assert that the Sixth Circuit in *DeMerrell* explained that "*Yates* was *no longer applicable law* because the 'possible erroneous actions taken by the officers prior to the shots being fired' is not a factor in determining whether the officers acted reasonably in making the split-second judgment to use deadly force." (Doc. 84 at 10 (quoting *DeMerrell*, 206 Fed. Appx. at 428).) (emphasis added).

Again, the Court disagrees with the Detectives. The Sixth Circuit in *Livermore* and *Dickerson* did not overrule *Yates*. As noted, *Livermore* and *Dickerson* both held that claims of excessive force in the Sixth Circuit must be analyzed in segments, such that a court's review is limited to officers'

43

actions in the moments preceding the shooting and that other actions leading up to that moment are deemed irrelevant.  *Yates*, however, is consistent with this segmenting approach, because the officer's objectively unreasonable actions in *Yates* that led to the use of deadly force did occur in the moments preceding the shooting.  Indeed, *Dickerson* cites and distinguishes *Yates* in one portion of its analysis and even characterizes *Yates* in another portion of the opinion as a case where the concurrence actually "analyze[d] the excessive force claim in segments."  *Dickerson,* 101 F.3d at 1159, 1161.  Thus, despite full awareness of *Yates* and its holding, the Sixth Circuit did not overturn it or find that its holding was inconsistent with the state of the law described in *Livermore* and *Dickerson*.

In fact, contrary to the Detectives' claim in their reply brief, the Sixth Circuit's decision in *DeMerrell* supports Chappell's position that *Yates* is still viable in light of that court's more recent pronouncements regarding the segmenting approach.  In *DeMerrell*, the plaintiff relied on *Yates* to argue that the officer's act of pulling his police SUV directly into the suspect's driveway escalated the situation and that he thereby acted in an objectively unreasonable manner.  206 Fed. Appx. at 427-28.  Rather than holding that *Yates* was no longer good law because of the segmenting approach, the Sixth Circuit distinguished the cases on their facts.  *Id.* at 428.  The Sixth Circuit first stated that, even if the officer violated tactical methods by pulling his SUV into the suspect's driveway, "that error occurred well before the shot was fired" and therefore "occurred prior to the shooting segment" and did not factor into the evaluation of whether the officer's actions were reasonable.  *Id.*  The Sixth Circuit also determined that *Yates* was inapplicable, because unlike the officer's actions in *Yates* leading to the use of deadly force, there was no causal connection between the officer's act of pulling his SUV into the suspect's driveway and the events surrounding the shooting.  *Id.*  The Sixth Circuit determined that, again unlike the officer's actions in *Yates*, the officer's acts in *DeMerrell* were merely negligent and

44

could not serve as a basis for a § 1983 claim. *Id.*; *cf. Whitlow*, 39 Fed. Appx. at 306-07 (analyzing only the short period of time between the officers' entry into the suspect's home and the shooting under the segmenting approach announced in *Dickerson* and rejecting the plaintiff's claim that a reasonable jury could find that the suspect did not realize he was dealing with police where the officers were undisputedly in full police gear and repeatedly shouted "police" and "search warrant").

While the Detectives are correct, moreover, that there is language is some Sixth Circuit decisions that directs district courts to focus on the "moments" before a use of deadly force occurs, they read too much into that phrasing. While the Sixth Circuit clearly employs a segmenting analysis, "the defendant's assertion that the holdings of these cases mandate that we look only at what occurred in the moments immediately before [McCloud] was fatally shot . . . too narrowly construes the cases' holdings." *Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001). In *Claybrook*, the Court found that the events there should be segmented into three stages: (1) the officers' approach and confrontation with the decedent; (2) the initial firefight in front of an open market; and (3) shots fired after Claybrook's move to a position behind concrete steps. The Court found that "all events taking place in the second and third segments [were] material to its analysis." *Id.* at 1105; *see also Gaddis v. City of Dearborn Heights*, 364 F.3d 763, 776 (6th Cir. 2004) (granting qualified immunity to officers in excessive force case, but interpreting *Dickerson*'s directive to consider "moments preceding the shooting" as one which requires a broader zone of inquiry – *i.e.*, one which still demands consideration of the context surrounding the firing of shots by the officers).[22]

---

[22] *Livermore* contains the strongest language in support of the Detectives' position on this point – stating that it "rejects" an approach which would hold officers liable for creating circumstances that create the need for the use of deadly force. 476 F.3d at 406-07. *Livermore* said that, however, in assessing whether an officer *who did not employ deadly force* could be liable for *another* officer's later need to do so. Thus, while the language appears broad, the factual

45

This Court similarly concludes that it can not slice its segmenting analysis as thinly as the Detectives would have it do.  Thus, while, as this Court found above, the events preceding the Detectives' approach to McCloud's bedroom are properly "segmented-out" of the Court's reasonableness determination, all events involved in the entry into and occurring once in McCloud's bedroom must be considered.  Thus, while it is clear from *Dickerson*, *DeMerrell*, and *Livermore* that *Yates* is limited to circumstances in which the officers' reckless actions occur in the same "temporal segment" as the use of deadly force by those officers, it is just as clear that *Yates* has not been overruled and remains binding precedent which this Court must follow in factual circumstances that are not readily distinguishable, as they were in *DeMerrell*.  *Accord Bell*, 1997 U.S. App. LEXIS 28738, at *13-14 (finding *Yates* distinguishable on its facts, but not implying that *Yates* is not precedent that district courts must consider and, where applicable, follow).[23]

Accordingly, because the Court has determined that *Yates* is factually similar to this case and because *Yates* is consistent with the segmenting approach adopted by the Sixth Circuit and appears to remain good law, the Court concludes that the "genuine issue" regarding whether the Detectives' failure to announce or identify themselves as "Cleveland Police" is "material" as to whether their use of deadly force was objectively unreasonable.  Further, taking the facts in the light most favorable to Chappell, the Court finds that a reasonable jury could conclude that the Detectives' use of deadly force was objectively unreasonable, and that their conduct violated McCloud's Fourth Amendment right to be free

circumstances in which it was used are fundamentally different than those in *Yates*, or here.  The Sixth Circuit in *Livermore*, moreover, reaffirmed the need to consider the "totality of the circumstances" surrounding the use of force, implying that *some* contextual analysis is still required.

[23]  Again, the Sixth Circuit has had multiple chances to overrule *Yates*, but has not done so.  While it may yet make that choice, this Court has no authority to make it for them.

from excessive force.  Chappell therefore has satisfied the first prong of the *Saucier* test.[24]

### b. Prong Two: Whether the Detectives Violated a "Clearly Established" Right

Because Chappell has shown that a reasonable jury could find that the use of deadly force was objectively unreasonable, the Court now must consider whether such a determination by the jury would indicate that the Detectives violated a clearly established constitutional right. *Saucier*, 533 U.S. at 201. To make this determination, the Court must define "the right allegedly violated . . . at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (same).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.  Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson*, 526 U.S. at 615).  This inquiry must be undertaken, moreover, "in light of the specific context of the case." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  To determine whether a right is clearly established, this Court must consider the decisions of the Supreme Court, followed by the decisions of this Circuit, followed by the decisions of other district courts within this Circuit, and finally the decisions of other circuits. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004).  Further, "[b]ecause the focus is on whether the officer had fair notice that her conduct was lawful, reasonableness is judged against the backdrop of the law at the time

---

[24] Because the Court finds that there are genuine issues of material fact as to whether the Detectives were objectively unreasonable in using deadly force against McCloud, the Court declines to address Chappell's alternative claim based on Balash's expert report that, even if the initial shots would have been justified, a portion of the Detectives' shots were fired after McCloud was in a seated and defenseless position in violation of McCloud's Fourth Amendment rights as discussed in *Russo*, 953 F.2d at 1045.

of the conduct." *Green*, 239 Fed. Appx. at 960 (quoting *Brosseau*, 543 U.S. at 198, and *Saucier*, 533 U.S. at 201).

Here, as of September 2005, McCloud had a "clearly established right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others." *Yates,* 941 F.2d at 447 (citations omitted); *Garner*, 471 U.S. at 11-12. It is "apparent that a reasonable official [as of 2005] would understand" that he was not entitled to shoot a person who does not pose a threat to the officers or society at large at the time of the shooting. *Yates*, 941 F.2d at 447 (citations omitted). More specifically, it also was clearly established in the Sixth Circuit, as of 1991, that it is objectively unreasonable for an officer to encounter a suspect in a confined, darkened area without identifying himself as a police officer, that doing so is more than mere negligence, and that any deadly force caused by that conduct is constitutionally impermissible. *Yates*, 941 F.2d at 447. Indeed, this specific principle had been endorsed and followed by courts outside this circuit on more than one occasion between 1991 and 2005. *See, e.g.*, *Sledd*, 102 F.3d at 288; *Estate of O'Bryan*, 2004 U.S. Dist. LEXIS 10160, at *36-*50. And, *Yates*' more general principle – that it is clearly established in the Sixth Circuit that one has the right not to be shot unless reasonably perceived to be a threat to the officers – had been, and continues to be, reaffirmed by citations to *Yates* in numerous Sixth Circuit panel opinions. *See, e.g.*, *Green*, 239 Fed. Appx. at 960; *Ciminillo*, 434 F.3d at 468.

Assuming that the facts are as Chappell asserts – that the Detectives did not announce themselves to be police officers, and that the Detectives' claim that they perceived McCloud to be a threat to them is not objectively unreasonable given McCloud's conduct – it was clearly established as of 2005 that the use of deadly force in such circumstances was excessive within the meaning of the Fourth Amendment. While the Court recognizes that this conclusion is, indeed, dependent upon

assumptions which are generous to Chappell, it is this Court's obligation to indulge them.  If "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," a district court should not grant immunity.  *Murray-Ruhl*, 246 Fed Appx. at 343 (quoting *Brandenburg*, 882 F.2d at 215-16; *see also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (noting that summary judgment on qualified immunity is "inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force").

For these reasons, the Court finds that, like prong one, prong two of the *Saucier* inquiry cannot be decided as a matter of law and the Detectives' request for qualified immunity as a matter of law must be denied.

Two additional points relating to the application of this prong of the analysis merit mention.  First, to the extent the Detectives' filings can be read to argue that confusion created by language in *Livermore* renders the right at issue here less than clear, their argument is not well-taken.  *Livermore* is a 2007 decision.  Any confusion created by its somewhat sweeping language, accordingly (language this Court has already found not confusing when placed in context), would have had no effect on the state of the law as of 2005.  *See Brosseau*, 543 U.S. at 200 n.4 (noting that decisions post-dating the incident at issue "are of no use in the clearly established inquiry").

Finally, and more importantly, if the jury concludes that the Detectives did in fact announce their presence, or the Sixth Circuit decides to overrule *Yates* and find that fact immaterial to an appropriate reasonableness analysis, the Court's conclusions on this issue of qualified immunity might change.  While, as noted, disputes of fact relating to the reasonableness inquiry *generally* also prevent qualified immunity determinations as a matter of law, that principle is not hard and fast.  Where the disputes of fact relate to the objective reasonableness of an officer's perceptions of a threat, it may well

49

be that, while a given jury might find those perceptions objectively unreasonable, qualified immunity could still attach.  "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized."  *Murray-Ruhl*, 246 Fed. Appx. at 343 (quoting *Sova*, 142 F.3d at 903); *see also Untalan*, 430 F.3d at 315-16 (noting that an officer "should not be deprived of qualified immunity for reasonably, though perhaps incorrectly in hindsight, perceiving an immediate and serious threat").

This Court has decided, however, that genuine disputes of fact exist *both* with respect to the question of whether it was objectively reasonable for the Detectives to perceive McCloud to be a true threat to their safety and with respect to whether they announced themselves to McCloud before encountering him.  And, the Court has found both of those issues to be material.  The Court does not decide, accordingly, whether qualified immunity would be granted if one or the other of those points were either not in dispute or not legally material.

Again, the Detectives' request for a judgment granting them qualified immunity as a matter of law with respect to the use of deadly force on McCloud must be **<u>DENIED</u>** at this juncture.

## C.   Chappell's Ohio Law Claims

The Detectives assert two arguments in an attempt to defeat Chappell's state law claims.  (*See* Doc. 63 at 28-30.)  First, the Detectives claim that they are entitled to statutory immunity with respect to all of Chappell's state law claims under O.R.C. § 2744.03(A)(6).  In particular, they argue both that § 2744.03(A)(6) provides general immunity for public employees and that police officers can only be liable for assault and battery when they employ excessive force.  Second, the Detectives argue that they cannot be liable because McCloud's own threatening conduct was an intervening cause that led to his death.

The Detectives' suggestion that § 2744.03(A)(6) provides blanket immunity is not well-taken.

50

In pertinent part, § 2744.03(A)(6) provides:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish non-liability:
> . . .
>> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>>
>>> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>>>
>>> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; . . . .

O.R.C. § 2744.03(A)(6)(a)-(b).  The Detectives correctly note that "[u]nder . . . § 2744.03(A)(6), an employee engaged in a governmental function is immune from tort liability unless he 'acted outside the scope of his employment or with malice, in bad faith, or in a reckless manner.'" (Doc. 63 at 29.)[25] The issue is thus whether the Detectives' conduct was outside the scope of their employment, with malice, in bad faith, or reckless.

As discussed above, whether the Detectives' conduct was reckless is a central issue in this case. Numerous Ohio decisions,[26] as well as opinions from courts within the Sixth Circuit,[27] define "recklessness" for purposes of § 2744.03(A)(6).  In defining "recklessness," Ohio law follows the

---

[25] *Quoting Boyer v. City of Mansfield*, 3 F. Supp. 2d 843, 848 (N.D. Ohio 1998).

[26] *See e.g.*, *Fabrey*, 639 N.E. 2d at 35; *Thompson v. McNeill*, 559 N.E. 2d 705, 708 (Ohio 1990); *Caruso v. State*, 737 N.E. 2d 563, 567 (Ohio Ct. App. 2000); *Thompson v. Bagley*, No. 11-04-12, 2005 WL 940872, at *11 (Ohio Ct. App. Apr. 25, 2005).

[27] *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002); *Jacobs v. Village of Ottawa Hills*, 159 F. Supp. 2d 693, 698-99 (N.D. Ohio 2001) (quoting *Caruso*, 737 N.E. 2d at 567, for the definition of the state-of-mind terms in § 2744.03(A)(6)).

51

Restatement of Torts (2d):  "The actor's conduct is in reckless disregard of the safety of others if . . . such risk is substantially greater than that which is necessary to make his conduct negligent."  *See e.g.*, *Fabrey*, 639 N.E.2d at 35.[28]  Here, construing the facts in the light most favorable to Chappell, the Court has already determined that a reasonable jury could find that the Detectives' conduct rises above the level of negligence and is objectively unreasonable.  The Court acknowledges that 'objective unreasonableness' under the test for qualified immunity on federal law claims is not identical to the standard for 'recklessness' under Ohio law.  *See Jacobs*, 159 F. Supp. 2d at 699.  Under Ohio law, the issue of state-of-mind under § 2744.03(A)(6) is generally a jury question, however.  *See Fabrey*, 639 N.E. 2d at 35.  Therefore, since Chappell's submissions are sufficient to raise a genuine issue of material fact with respect to the objective unreasonableness prong of federal qualified immunity, the Court finds that whether this same evidence satisfies the Ohio definition of reckless disregard should also be determined by the jury.  Accordingly, the Detectives are not immune from the Plaintiff's state law claims under § 2744.03.

The Detectives' more specific statutory argument, that the Detectives' use of force is protected because it was employed in self-defense, fails based on the Court's finding that a genuine issue of material fact exists concerning whether the Detectives' use of force was excessive.  Although the

---

[28]  The Ohio Supreme Court has also articulated the Restatement test as follows:

This court has defined the term "reckless" to mean that the conduct was committed "'knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 96, 559 N.E.2d 699, 700, fn. 2, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500.

*Cater v. City of Cleveland*, 697 N.E. 2d 610, 618 (Ohio 1998).

52

Detectives note that a police officer is entitled to use force to protect himself and others from bodily harm, they also concede, citing *Schweder v. Baratko*, 143 N.E.2d 486, 489 (Ohio Ct. App. 1957), that a Detective  may be held liable for assault and battery where "excessive force is used."  In the context of step one of the *Sacier* test for qualified immunity above, the Court carefully analyzed the issue of whether the Detectives used excessive force under the circumstances of this case and concluded that, construing the facts in the light most favorable to the Plaintiff, a genuine issue of material fact exists with respect to this issue.  Accordingly, a reasonable jury could find that the Detectives used excessive force, and, thus, are liable for assault and/or battery.

The Detectives' final argument, that State law precludes liability because McCloud's own actions were an intervening cause of his death, is also unsupported.  The Detectives cite only a single case for this proposition.  (Doc. 63 at 29 (citing *Whitlow*, 39 Fed. Appx. 297).)  As an initial matter, *Whitlow* is inapposite to this case for the reasons discussed above.  Perhaps even more to the point, however, *Whitlow* analyzed Kentucky law, which does not govern the actions of Detectives in Cleveland.  *See Whitlow*, 39 Fed. Appx. at 307.  This Court can find no support within Ohio law for the Detective's assertion.  Rather, Ohio law allows a jury to determine whether the Detective's conduct was the proximate cause of McCloud's death.  *See Winegar v. Greenfield Police Dep't*, 2002 Ohio 2173, P69 (Ohio Ct. App. Mar. 27, 2002) ("Where the facts are such that reasonable minds could differ as to . . . whether the intervening act or cause constituted a concurrent or superseding cause . . . [and] whether the intervening cause was reasonably foreseeable by the original party . . . [are] questions for submission to a jury which generally may not be resolved by summary judgment.").

Accordingly, the Detectives' joint motion for summary judgment on Chappell's Ohio law claims is **DENIED**.

## IV.  CONCLUSION

Cases like these are tragic for all involved – the deceased, their families and the officers as well. Just as Brandon McCloud's family is forever scarred by his loss, so too are Detectives Habeeb and Kraynik and their families.  The Detectives' initial purpose was surely to protect the community from further illegal activities by McCloud.  Later, the Detectives made a judgment which they believe was necessary to protect themselves.  The results of that judgment were tragic; surely no one wanted McCloud to die, and the Detectives no doubt remain haunted by the events of that early morning.

The Court does not, and would not presume to pass moral judgments upon McCloud, his family, or the Detectives.  The very narrow question before the Court now is whether, on the record before it, there are genuine disputes of material fact that prevent judgment in the Detectives' favor on their claim of qualified immunity and require further inquiry before a jury.  While the Court has found that certain legal and factual issues are not open to fair debate – such as whether McCloud was holding a knife when encountered – it also finds that there is genuine dispute over a host of other important facts.  It is this reservoir of disputed facts which, at least under current, binding Sixth Circuit precedent, counsels against a judgment granting qualified immunity to the Detectives at this stage of the proceedings.

Accordingly, for the foregoing reasons, the Court concludes that the Detectives' joint motion for summary judgment based on qualified immunity as to Chappell's Fourth Amendment excessive force claim under § 1983 is **DENIED**.  In addition, summary judgment is **DENIED** with respect to Chappell's Ohio law claims.

**IT IS SO ORDERED.**

*s/ Kathleen M. O'Malley*
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated:  September 30, 2008**